Receipt number AUSFCC-11474926

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GROUNDSWELL, INC.,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Civ. No. [•] 26-1394 C |

**COMPLAINT**

1. This is a breach-of-contract action arising out of the United States Environmental Protection Agency's ("EPA") unilateral and unlawful decision to terminate a competitive grant awarded to Plaintiff Groundswell, Inc. ("Groundswell") under the EPA's Environmental and Climate Justice Community Change Grants Program. Groundswell's Grant Agreement with the EPA created binding contractual obligations between the parties. Groundswell now seeks damages for the harms resulting from the EPA's breach.

2. The Inflation Reduction Act of 2022 created the Environmental and Climate Justice Program ("ECJP"), providing $2.8 billion in grants to help disadvantaged communities address a wide range of environmental and climate justice issues. In its implementation of the ECJP, the EPA created four grant programs, including the Community Change Grants ("CCG") Program.

3. The CCG program was aimed at empowering communities and their partners to design, develop, and implement multi-faceted community-driven projects addressing the needs of disadvantaged communities through a variety of strategies, including: reducing and preventing pollution, building resilience to climate change and mitigating climate risks, enhancing

involvement in government processes related to environmental and climate justice, and expanding access to jobs and economic opportunity through workforce development.

4. In alignment with its mission, Groundswell competed for a CCG grant in August 2024.

5. On December 10, 2024, the EPA officially awarded Groundswell and its statutory partner, the City of Lanett, Alabama ("Statutory Partner"), a CCG in the amount of $20 million to bring relief to seniors and hardworking Americans living in substandard and unhealthy living conditions, overlaid with the undue burden of excessively high utility costs. This award was subject to a Grant Agreement between the EPA and Groundswell.

6. Groundswell executed project implementation goals and strategies by meeting with its Statutory Partner as well as the mayors and community leaders representing the communities directly benefiting from the award.

7. Groundswell commenced structuring the framework for its community advisory council and gathered insights from community partners on programmatic goals, community engagement priorities, and workforce development needs.

8. On May 2, 2025, the EPA notified Groundswell that it was unilaterally terminating the Grant Agreement "effective immediately."[1]

9. EPA grantmaking regulations required EPA to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[2] EPA complied with this requirement. Specifically, paragraph 3 of the EPA General Terms and Conditions states that termination is appropriate only:

---

[1] Notice of Termination of EPA Assistance Agreement 5F-03D30524 under 2 CFR 200.340, May 2, 2025.

[2] 2 C.F.R. § 200.340(b).

1. If a recipient fails to comply with the terms and conditions of the award;

2. By mutual agreement of the parties;

3. If the recipient decides to terminate the award unilaterally; or

4. Pursuant to the programmatic terms and conditions specified in the award.

10. EPA also "maintain[ed] the right to terminate the grant when the noncompliance with the terms and conditions is substantial, such that effective performance of the grant is materially impaired or there is adequate evidence of fraud, waste, or abuse."[3]

11. *None of those conditions were present at the time of termination.* By terminating Groundswell's Grant Agreement without cause, the EPA breached the terms of the Grant Agreement.

12. While the Notice of Termination purports to justify the termination because (1) "the remaining portion of the Award will not accomplish EPA funding priorities for achieving program goals," and (2) "[t]he objectives of the award are no longer consistent with EPA funding priorities," *neither* of those reasons is set forth in the Agreement as a basis for termination.[4]

13. Importantly, a *later* version of the EPA General Terms and Conditions (updated April 3, 2025), which was not included as part of the Grant Agreement, specifically added a "*new* termination provision if the award no longer effectuates the program goals or agency priorities."[5] This "new" language added a fifth basis for termination that is not found in the Groundswell Grant Agreement: "if an award no longer effectuates the program goals or agency priorities."

---

[3] Community Change Grants Terms and Conditions, Section H.3.

[4] Notice of Termination of EPA Assistance Agreement 5F-03D30524 under 2 CFR 200.340, May 2, 2025 ("Notice of Termination").

[5] Available at https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf. (emphasis added).

Importantly, EPA recognized that this new fifth provision "*applies to all new awards and funding amendments ... made on or after April 3, 2025*."[6] Groundswell never agreed to incorporate this new language into the Grant Agreement, which was awarded on December 10, 2024. And, the fact that EPA felt that this "new" language was necessary demonstrates quite clearly that the prior version of the General Terms & Conditions did not give EPA the unilateral termination right that was assumed in the Notice of Termination.

14. By unilaterally terminating the Grant Agreement with zero legal justification and cutting off the grant funds contractually obligated to Groundswell, the EPA breached the Grant Agreement's express terms and violated the implied covenant of good faith and fair dealing.

15. Further, Groundswell's termination was just one of many grants terminated in this arbitrary nature. In fact, the EPA terminated every statutorily mandated ECJP grant, an action which the United States District Court for the District of South Carolina has ruled as contrary to law and arbitrary and capricious. *See The Sustainability Inst. v. Trump*, No. 2:25-cv-2152-RMG, 2026 WL 1694522, at *5 (D.S.C. June 11, 2026), *notice of appeal filed* July 31, 2026.

## JURISDICTION

16. Jurisdiction over the claims advanced in this case is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1).

## PARTIES

### I. PLAINTIFF

17. Groundswell, Inc. ("Groundswell") is a nonprofit organization pursuant to 26 USC § 501(c)(3) and headquartered in Washington, DC. Established in 2009, Groundswell builds community power by developing clean energy projects and making energy more affordable.

[6] *Id*. (emphasis added).

Having delivered $8 million in savings to hardworking families, Groundswell strives to cut electricity bills in half for households that need savings the most, while strengthening local economic resilience by partnering with municipalities, local and regional utilities, nonprofit and for-profit corporations, churches, state agencies, and the Federal government.

## II. DEFENDANT

18. Defendant is the United States of America, acting through the Environmental Protection Agency.

## FACTUAL BACKGROUND

## III. THE EPA'S ENVIRONMENTAL AND CLIMATE JUSTICE PROGRAM

19. On August 16, 2022, the Inflation Reduction Act ("IRA") was signed into law. Pub. Law 117-169, 136 Stat. 1818.

20. The IRA created the Environmental and Climate Justice Program ("ECJP")—the largest investment in environmental and climate justice in U.S. history. The ECJP was codified in Section 138 of the Clean Air Act, 42 U.S.C. § 7438.

21. Under this program, the EPA was provided with $2.8 billion to award grants to help disadvantaged communities address a wide range of environmental and climate justice issues, and $200 million for technical assistance related to these grants.

22. To ensure these grants benefited those most impacted by pollution and environmental harms, Congress instructed that the EPA Administrator shall use the funds to award grants to eligible entities to carry out a range of environmental and climate justice activities. The activities included investments in low and zero emission technologies, workforce development helping reduce greenhouse gas emissions and other air pollutants, mitigation of climate and health risks from extreme heat and wildfire events, advancement of climate resiliency and adaptation, and facilitation of engagement with disadvantaged communities. *See* 42 U.S.C. § 7438(b)(2).

23. Following Congress's mandate, the EPA created four grant programs, including the Community Change Grant ("CCG") program. The CCG program funds projects that enhance climate resiliency, mitigate climate and health risks, engage in community-led air and water pollution monitoring, and support workforce development for greenhouse gas reduction and pollution abatement in disadvantaged communities most burdened by environmental and health harms.

24. In its Notice of Funding Opportunity ("NOFO") soliciting grant applications, the EPA underscored the "historic level of support" provided by the CCG program, which would enable communities to overcome longstanding environmental challenges and implement meaningful solutions to meet community needs "now and for generations to come."[7]

25. Following Congress's direction, the EPA established a competitive bidding process to receive and assess grant proposals for the CCG program. The EPA selected 105 recipients from 2,700 applications and awarded a total of nearly $1.6 billion to proposals that the agency judged best able to carry out Congress's mandate. Groundswell was among those grant recipients.

## IV. GROUNDSWELL'S EAST ALABAMA RESILIENCE AND ENERGY COALITION GRANT

26. Groundswell serves rural, small-town, and urban communities in the Midwest, Mid-Atlantic, and Southeast. Groundswell's mission is to support local energy resilience and efficiency to preserve affordable housing, strengthen energy grids, and support the development of local economies.

27. Groundswell works to achieve its mission by: expanding access to solar power generation and storage; assisting communities in making their homes more energy efficient to

[7] *Environmental and Climate Justice Community Change Grants Program Notice of Funding Opportunity (NOFO)*, EPA (Oct. 2, 2024), https://perma.cc/HB8N-84N2.

lower utility costs, increase comfort, and improve the standard of living of residents; and ensuring that communities will have access to power to support critical emergency services before, during, and after emergency events.

28. Groundswell forms partnerships with municipalities, local and regional utilities, nonprofit and for-profit corporations, churches, state agencies, and the Federal government, to support its long-term goals.

29. As a part of the continuation of Groundswell's community-focused mission, in August 2024, Groundswell submitted a grant proposal titled "East Alabama Resilience and Energy Coalition" ("EAREC") to the EPA to support community resilience hubs, residential electrification of energy efficiency upgrades, and community education in East Alabama and West Georgia.

30. On December 10, 2024, U.S. Environmental Protection Agency ("EPA") officially awarded Groundswell and its statutory partner, the City of Lanett, Alabama, ("Statutory Partner") an EPA Community Change Grant ("CCG") in the amount of $20 million to bring relief to seniors, retirees, and hardworking Americans living in substandard and unhealthy living conditions, overlaid with the undue burden of excessively high utility costs. For decades, many have suffered poor indoor air quality; extreme indoor temperatures; spoiled foods due to lack of electrification of appliances; unstable flooring (such as kitchen floors, often resulting in limiting meals to canned foods since cooking on a stable kitchen floor is not an option); leaky roofs; cracks in the walls allowing for rodents to enter; and poor or no window and housing insulation. Additionally, poor housing conditions contribute to high utility bills for many despite the relatively low cost of electricity in the region. In order to keep the lights on, residents often have to make difficult tradeoffs around household spending, affecting family well-being and local economic success. Groundswell and the City of Lanett, in partnership with other municipalities, have worked

collaboratively with EPA to design a program aimed at cutting the utility bills of seniors, retirees, and hardworking Americans in half by providing financial assistance for the repair and weatherization of 500 houses. Additionally, through the development of ten (10) resilience hubs, local preparedness is enabled by giving seniors, retirees, and hardworking families access to electricity and heating or cooling during power outages or other disruptive events. The City of Lanett is a direct beneficiary of a truck for city operations.

31. This project targeted low- and moderate-income communities in the following contiguous counties in East Alabama and West Georgia: Chambers County (AL), Clay County (AL), Macon County (AL), Randolph County (AL), Tallapoosa County (AL), and Troup County (GA).

32. The Grant Agreement is a public purpose agreement within the meaning of 31 U.S.C. § 6304. The competitive process by which the CCG program awards were made demonstrates that the award met the goals of the program and fulfilled the statutory mandate.

33. Shortly after receiving notice of its award, Groundswell commenced work under the Grant Agreement and began drawing down grant funds.

34. Groundswell executed project implementation goals and strategies by meeting with its Statutory Partner and the mayors and community leaders representing the communities directly benefiting from the Award. Groundswell commenced structuring the framework for its community advisory council and gathered insights from community partners on programmatic goals, community engagement priorities, and workforce development needs. Groundswell was in the process of: (1) working with its Statutory Partner and community members to develop criteria for local contractors to bid on residential energy efficiency repairs and upgrades; (2) establishing data sharing protocols with municipal stakeholders; (3) finalizing requests for proposals to publish in

the second quarter of the year; (4) conducting community outreach for potential program participants; (5) recruiting community members to participate in the advisory council; and (6) identifying sites for community resilience hubs when it received the first memorandum of termination.

35. On May 2, 2025, the EPA abruptly and without prior notice advised Groundswell that its grant was terminated and ordered Groundswell to cease work on the EAREC project. The abrupt and unexpected termination severely impacted Groundswell's ability to provide the economic benefits of energy efficiency upgrades and critical home repairs outlined in Groundswell's grant to six (6) counties in East Alabama and West Georgia that had suffered an extended period of economic distress from the offshoring of America's textile industry that was once the most important employer in the area. For example, in the towns of Lanett and Valley, Alabama and in West Point, Georgia, West Point Pepperell Inc. (now WestPoint Home) was the largest employer in the area. Following the enactment of NAFTA in 1994, local mills were closed, and the company was sold, leaving hardworking people who had worked in the mills for decades without jobs and without any retirement savings due to the structure of the sale. These same residents—all impacted by the offshoring of American jobs—now live in homes that they own, but which many cannot afford to heat, cool, or repair on fixed social security incomes. The widespread disrepair of area housing has a further negative impact on economic development. Improving local disaster preparedness, cutting electricity bills, and making area housing more affordable will therefore have the additional benefit of improving economic development opportunities in these parts of Alabama and Georgia.

36. At the time of termination, Groundswell had incurred costs in excess of $165,000 under the terms of the Grant Agreement.

## V. THE EPA'S TERMINATION OF THE GRANT WAS UNLAWFUL

37. The EPA has not contested that it terminated the entire ECJ Program. *The Sustainability Inst.*, 2026 WL 1694522, at *1. This admission through declarations filed in *The Sustainability Inst*. is binding on the EPA.

38. The EPA cancelled the entirety of the ECJP unlawfully. *See id*. at *5. The District Court for the District of South Carolina reasoned that the "premature shuttering of the ECJ Program and refusal to administer it" were contrary to the express intent of Congress and arbitrary and capricious. *Id*. The District Court declined, however, to issue a permanent injunction, and directed the affected parties to this Court to seek damages. *Id*.

39. The District Court's determination that the EPA's actions cancelling the ECJP in contravention of § 7438 was unlawful, *id.* at *5, establishes that the termination of Groundswell's Grant Agreement was unlawful.

40. Further, the applicable terms and conditions of the Grant Agreement provided for unilateral termination by the EPA only under limited circumstances, none of which existed at the time of termination on May 2, 2025.

41. The General Terms and Conditions referenced by and incorporated into the Grant Agreement authorized the EPA to unilaterally terminate the grant only in the event of the grantee's failure to comply with the terms and conditions of the grant, or to terminate pursuant to the programmatic terms and conditions specified in the grant.

42. The programmatic terms and conditions referenced by and incorporated into the Grant Agreement provide for termination by the EPA only as a result of the grantee's substantial noncompliance with the grant's terms and conditions, or where evidence of the grantee's fraud, waste, or abuse supports termination for noncompliance under 2 C.F.R. § 200.339. There were no

other provisions for termination, and any unilateral termination provisions must be clearly and unambiguously incorporated into the Grant Agreement.

43. At all relevant times, Groundswell fully performed each of the duties and obligations it was required to perform under the Grant Agreement.

44. In its May 2, 2025, memorandum to Groundswell ("Termination Memorandum"), EPA notified Groundswell that it was unilaterally terminating the Grant Agreement "effective immediately." The Termination Memorandum stated the Agreement was being terminated "on the grounds that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals" and because "[t]he objectives of the award are no longer consistent with EPA funding priorities." No other reasons for termination were provided in the Termination Memorandum.

45. Also on May 2, 2025, EPA transmitted to Groundswell an amendment to the Grant Agreement notifying Groundswell of its unilateral termination of the grant ("Termination Amendment"). The Termination Amendment did not specify the grounds for termination, but stated generally that, "[t]he Agency is asserting its right under 2 CFR § 200.340 and the Termination General Terms and Conditions of this agreement to unilaterally terminate this award."

46. The Grant Agreement's terms and conditions did not authorize the EPA to terminate Groundswell's grant on the grounds that the grant award no longer effectuated program goals or agency priorities. The Grant Agreement's terms and conditions did not incorporate 2 C.F.R. § 200.340. *See* 2 C.F.R. § 200.340(b) (requiring that "[t]he Federal agency … must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award").

47. On or about April 3, 2025, 111 days after the execution of the Grant Agreement, the EPA purported to amend paragraph 3.e of its FY 2025 General Terms and Conditions to add language permitting termination of a grant "if an award no longer effectuates the program goals or agency priorities." The EPA did not amend the terms and conditions of Groundswell's Grant Agreement to include this provision, either in April 2025, or at any time thereafter.

48. At no time did the EPA notify Groundswell that it had failed to comply with any of the terms or conditions governing the Grant Agreement, or that it had engaged in waste, fraud, or abuse in connection with the grant. Nor did the EPA at any time cite any such conduct as a purported reason for its termination decision. The EPA's stated reasons for termination were unrelated to any purported noncompliance, fraud, waste, or abuse by Groundswell.

49. Even if the EPA had been permitted to terminate the Grant Agreement on the ground of a change in agency funding priorities, which it was not, no such change occurred. EPA did not identify its existing priorities, did not identify a change in those priorities, and did not analyze how its award to Groundswell no longer effectuated agency priorities. As stated by the District Court in *Sustainability Institute*, "contrary to Congress' will, EPA issued guidance that shuttered the ECJ Program before its end date, of September 30, 2026. *See* 42 U.S.C. § 7438(a)(1)." *Sustainability Inst.*, 2026 WL 1694522, at *4. In fact, the Grant Agreement was entirely consistent with Congress's statutory mandate and the EPA's stated priorities of prioritizing merit and eliminating waste, fraud, and abuse (neither of which was a change in agency funding priorities), and the EPA made no findings to the contrary.

50. The EPA breached the Grant Agreement by unilaterally terminating it in violation of the terms and conditions specifying the sole bases for its termination.

51. At all relevant times, Groundswell was fully ready, willing, and able to perform each of its obligations under the Grant Agreement. Groundswell fully complied with the terms of the NOFO and the Grant Agreement and was fulfilling the public purpose of the Grant Agreement, despite the EPA's consistent failure to fulfill its part in the contract by suspending Groundswell's access to its ASAP account.

52. By suspending Groundswell's ASAP account, the EPA effectively seized Groundswell's grant money without notice or explanation for the amount of money taken, and without regard for any pending costs Groundswell had already committed to incurring in reliance on the funds' availability.

## VI. GROUNDSWELL TIMELY SUBMITTED ITS ADMINISTRATIVE DISPUTE TO THE EPA; NO FURTHER EXHAUSTION IS REQUIRED

53. The May 2, 2025 Termination Amendment notified Groundswell that if it disagreed with its terms and conditions, Groundswell was required to furnish a notice of disagreement to the EPA within 21 days after its mailing date.

54. Citing 2 C.F.R. § 1500.15, the May 2, 2025 Termination Memorandum instructed Groundswell that if it wished to dispute the termination decision, it must submit its dispute to the EPA no later than 30 calendar days from the date of the Termination Memorandum.

55. By letter dated May 20, 2025, Groundswell submitted to EPA its timely Notice of Disagreement with the Termination Amendment. Groundswell's notice included a request that the Grant Agreement be reinstated.

56. On May 30, 2025, Groundswell submitted to EPA its timely Notice of Dispute and Response to EPA's Notice of Termination, which reiterated the disagreement outlined in the May 20, 2025 letter.

57. On July 11, 2025, EPA responded to Groundswell's May 30, 2025 dispute challenging the termination ("EPA Response"). EPA's Response makes conclusory but unsupported claims that the EPA conducted "an individualized, grant-by-grant review," which led the Agency to conclude that Groundswell's grant did not align with priorities or the purposes for which the Award was made.

58. In fact, no individualized review was conducted prior to the termination of Groundswell's grant. EPA's Response attached no documentation or evidence of individualized review, and two separate Federal District Courts have determined that EPA did not conduct any individualized review prior to its *en masse* termination of ECJP grants. In *Sustainability Inst. v. Trump*, following review of extensive discovery, the District Court for the District of South Carolina found that "not a single document was produced which evidenced any review by the EPA." *Sustainability Inst. v. Trump*, No. 2:25-CV-2152-RMG, 2025 WL 1486979, at *3 (D.S.C. May 20, 2025). Similarly, the District Court for the District of Rhode Island has held that EPA's grant freezes were "sudden, indefinite, across-the board, and likely unlawful." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *23 (D.R.I. Apr. 15, 2025), *aff'd in part, vacated in part by Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*, 186 F.4th 25 (1st Cir. 2026).

59. On August 29, 2025, the EPA notified Groundswell by email that its request for reinstatement was "dismiss[ed]," and the administrative dispute concerning the termination was "moot" because the One Big Beautiful Bill Act had rescinded "unobligated balances" from all EPA IRA accounts except for funding to reduce air pollution at ports. This assertion was incorrect because the funds obligated under the Grant Agreement were not unobligated. Groundswell disputed the August 2025 determination by letter dated September 12, 2025.

60. Following additional communications with the EPA, Groundswell submitted its request for pre-termination and closeout costs, reserving its rights. EPA has reimbursed those costs, but reimbursement of pre-termination and closeout costs is insufficient to make Groundswell whole following the EPA's arbitrary termination of the Grant Agreement.

61. Although Groundswell chose to administratively dispute the termination by the EPA, neither the Grant Agreement nor applicable statutes or regulations require Groundswell to exhaust administrative remedies or otherwise obtain an administrative decision before pursuing an action in this Court. Further, requiring Groundswell to continue pursuing an administrative claim before litigating its Tucker Act claim would be futile, inadequate, and result in irreparable injury.

## VII. HARMS TO GROUNDSWELL

62. Groundswell has suffered compensable harm as a result of the EPA's unlawful termination of the Grant Agreement and is entitled to recover any and all expectation, reliance, restitution and other damages, including, but not limited to, the damages described in the following paragraphs.

63. Damages for breach of contract shall place the wronged party in as good a position as it would have been in had the breaching party fully performed its obligation. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344–45 (Fed. Cir. 2003); *Mass. Bay Transp. Auth. v. United State*s, 129 F.3d 1226, 1232 (Fed. Cir. 1997). Damages are calculated by "perform[ing] the necessary comparison between the breach and non-breach worlds." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008).

64. It was reasonably foreseeable to the EPA at the time of entering the Grant Agreement that unlawful termination would render it liable for the remainder of the full award amount. The EPA created the grant in order to carry out the public purpose for which Groundswell

successfully competed for funding, and the EPA agreed to support. Only the full amount of the award would place Groundswell in the same position it would have been absent the breach. Compensating Groundswell only for pre-termination and closeout costs provides only those payments that the EPA must make to Groundswell under 2 C.F.R. § 200.343 and 2 C.F.R. § 200.472 without regard to its breach of the Grant Agreement. The public purpose contemplated by the parties to the Grant Agreement—as well as Congress's intent in passing the IRA—remains unfulfilled.

65. Groundswell has been deprived of the vast majority of the $20,000,000 awarded to it in the Grant Agreement, including all grant funds not previously released or remitted to Groundswell through its ASAP account or otherwise. Absent the EPA's breach, Groundswell would have had full access to and use of these funds in completing the project work described in the Grant Agreement, thereby accomplishing the grant's statutorily authorized public purpose. At a minimum, Groundswell is entitled to recover as damages the total amount of the grant award, less funds previously distributed, in order to place Groundswell in the position it would have occupied absent the EPA's unlawful termination.

66. The EPA's unlawful actions have also damaged Groundswell by impairing its mission and depriving it of the means of assisting East Alabama and West Georgia residents in meeting the environmental and economic challenges they face and otherwise advancing the well-being of the community through the East Alabama Resilience and Energy Coalition project.

67. Groundswell has suffered additional compensable harm due to the sudden and unanticipated disruption to its operations and the resulting need to redeploy its personnel and resources which had already been deployed in service of fulfilling the Grant Agreement, both in

the short term and for the duration of the three-year project period, as well as other specific and compensable consequences of the terminated grant.

68. As a result of the EPA's unlawful actions, Groundswell was unable to develop and implement programs that would have served as exemplars for other communities located throughout the rural South. Groundswell has suffered compensable harm resulting from being denied the opportunity to refine and leverage these programs in order to assist other communities that seek to mitigate climate-related harms through innovative and sustainable strategies.

## CLAIMS FOR RELIEF

### COUNT I

### Breach of the Grant Agreement

69. Groundswell incorporates by reference the allegations contained in the preceding paragraphs.

70. To recover for breach of contract, Groundswell must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

71. The Grant Agreement is a binding contract between Groundswell and the EPA that contemplates money damages.

72. The Grant Agreement was entered into by officials at the EPA with authority to bind the United States.

73. The EPA breached the express terms of the Grant Agreement by wrongfully terminating it and denying Groundswell access to the funds it was owed. The EPA identified no valid grounds for termination.

74. The EPA's breach of the Grant Agreement has caused Groundswell to suffer substantial monetary damages, in an amount of $19,828,869.74 in breach damages—the total outstanding amount of the CCG Award, including, but not limited to, the damages described in Paragraphs 66–68 above.

**COUNT II**

**Breach of the Duty of Good Faith and Fair Dealing**

75. Groundswell incorporates by reference the allegations contained in the preceding paragraphs.

76. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (citation omitted).

77. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

78. The Grant Agreement is a binding contract that contemplates money damages.

79. The Grant Agreement was entered into by officials at the EPA with the authority to bind the United States.

80. The Grant Agreement contained a provision by which the EPA agreed to make a specified amount of federal funds obligated to Groundswell for its East Alabama Resilience and Energy Coalition project.

81. Groundswell entered into the Grant Agreement with the EPA with the reasonable expectation that the EPA would comply with the terms of that Agreement, and that the EPA would act in good faith and deal fairly with Groundswell.

82. The EPA breached the Grant Agreement's implied duty of good faith and fair dealing by, among other things: targeting the Grant Agreement for unilateral termination in violation of the Agreement's terms and conditions, directing Groundswell to stop work under the Agreement, denying Groundswell access to funds already awarded to Groundswell without prior notice or explanation, preventing Groundswell from spending money already awarded to it, unilaterally seeking to impose new terms and conditions on Groundswell, contending that EPA had conducted an individualized review of Groundswell's grant prior to termination when in fact it had not, and insisting that the funds already awarded to Groundswell were unobligated despite factual and legal support to the contrary.

83. The EPA's actions interfered with Groundswell's performance under the Grant Agreement and destroyed Groundswell's reasonable expectations regarding the fruits of its Grant Agreement.

84. Upon information and belief, the EPA's actions were intended to interfere with Groundswell's ability to execute the East Alabama Resilience and Energy Coalition project plans set forth in its grant proposal and the Grant Agreement, despite lacking any legal authority to do so.

85. The EPA's actions caused Groundswell to suffer substantial monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Groundswell prays that this Court enter judgment against the United States as follows:

i. Awarding money damages to Groundswell in an amount of $19,828,869.74 in breach damages—the total outstanding amount of the CCG Award;

ii. Awarding any allowable pre- and post-judgment interest;

iii. Awarding Groundswell reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

iv. Granting other such relief as this Court may deem proper.

Dated: September 18, 2026

Respectfully submitted,

*/s/Gary DiBianco*
GARY DIBIANCO
LAWYERS FOR GOOD GOVERNMENT
1319 F St. NW, Suite 301
PMB 181
Washington, DC 20004
Phone: 404-913-5529
gary@lawyersforgoodgovernment.org

*Counsel of Record*

– AND –

GILBERT LLP
Sonia W. Murphy
Brittney M. Welch
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Phone: 202-772-2319
murphys@gilbertlegal.com
welchb@gilbertlegal.com

*Of Counsel*